UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| L.C., on behalf of A.S., a minor, | CASE NO. C17-1365JLR |
| Petitioner, | ORDER ON ADMINISTRATIVE APPEAL |
| v. | |
| ISSAQUAH SCHOOL DISTRICT, | |
| Respondent. | |

## I.    INTRODUCTION

Petitioner L.C. appeals on behalf of her daughter, A.S., from the decision of an administrative law judge ("ALJ") that Respondent Issaquah School District ("the District") upheld its obligations under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*.  Before the court are three motions:  (1) L.C.'s motion to amend the complaint (Mot. to Am. (Dkt. # 64)); (2) L.C.'s motion for summary judgment (L.C. MSJ (Dkt. # 34)); and (3) the District's cross-motion for summary judgment (Dist. MSJ (Dkt. # 35)).  L.C. filed an opposition to the District's summary

judgment motion, which also serves as a reply in support of her summary judgment

motion. (L.C. Reply (Dkt. # 41).) The District filed a reply in support of its summary

judgment motion. (Dist. Reply (Dkt. # 44).) The court has reviewed the administrative

record, the submissions of the parties, and the applicable law. Being fully advised,[1] the

court DENIES L.C.'s motion to amend the complaint. The court further DENIES L.C.'s

motion for summary judgment, GRANTS the District's motion for summary judgment,

and AFFIRMS the decision of the ALJ.

## II.    BACKGROUND

**A.    Statutory Context**

"The IDEA is a comprehensive educational scheme, conferring on disabled

students a substantive right to public education." *J.W. ex rel. J.E.W. v. Fresno Unified*

*Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010) (quoting *Hoeft v. Tucson Unified Sch. Dist.*,

967 F.2d 1298, 1300 (9th Cir. 1992)). In exchange for IDEA funds, school districts must

---

[1] L.C. requests oral argument on her summary judgment motion. (L.C. MSJ at Title Page.) The general rule is that the court should not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied. *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964). However, a district court's denial of a request for oral argument on summary judgment does not constitute reversible error in the absence of prejudice. *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v. Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)). There is no prejudice in refusing to grant oral argument where the parties have had ample opportunity to develop their legal and factual arguments through written submissions to the court. *Id.* ("When a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument] . . . .") (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*). L.C. has provided the court lengthy written submissions in support of her summary judgment motion and in opposition to the District's summary judgment motion. (*See generally* L.C. MSJ; L.C. Reply.) The court has determined that oral argument would not be of assistance in deciding L.C.'s motion, *see* Local Rules W.D. Wash. LCR 7(b)(4), and thus DENIES L.C.'s request for oral argument.

provide a free appropriate public education ("FAPE") to all eligible children. *See* 20 U.S.C. § 1400(d)(1)(A); *see also id.* § 1412(a)(1). A FAPE, as the IDEA defines it, includes both "special education" and "related services." *Id.* § 1401(9). "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction. *Id.* §§ 1401(26), (29). A school district must provide a child with disabilities such special education and related services "in conformity with the [child's] individualized education program," or "IEP." *Id.* § 1401(9)(D).

"The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, --- U.S. ---, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). A comprehensive plan prepared by a child's "IEP Team," which includes teachers, school officials, and the child's parents, an IEP must be drafted in compliance with a detailed set of procedures. 20 U.S.C. § 1414(d)(1)(B) (internal quotation marks omitted). An IEP must contain, among other things, "a statement of the child's present levels of academic achievement," "a statement of measurable annual goals," and "a statement of the special education and related services to be provided to the child." *Id.* § 1414(d)(1)(A)(i). When formulating an IEP, a school district "must comply both procedurally and substantively with the IDEA." *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982)).

//

When parents and educators disagree about what a child's IEP should include, the parties may turn to dispute resolution procedures established by the IDEA. *See* 20 U.S.C. §§ 1415(e), (f)(1)(B)(i). If mediation fails to produce an agreement, the parties may proceed to what the IDEA calls a "due process hearing" before a state or local agency. *Id.* §§ 1415(f)(1)(A). In Washington State, the Office of Administrative Hearings, a state administrative agency, conducts IDEA due process hearings. *See* RCW 28A.155.020; WAC 392-101-010(2). At the end of the administrative process, the losing party may seek redress in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

A school district may violate the IDEA in two different ways. "First, a school district, in creating and implementing an IEP, can run afoul of the Act's procedural requirements." *Fresno Unified*, 626 F.3d at 432 (citing *Rowley*, 458 U.S. at 206). "Second, a school district can be liable for a substantive violation by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits." *Fresno Unified*, 626 F.3d at 432 (citing *Rowley*, 458 U.S. at 206-07); *see also Endrew F.*, 137 S. Ct. at 999.

**B.      Factual Background**

1.      Referral for Special Education Services

A.S. began attending kindergarten at an elementary school in the District in 2013. (Administrative Record ("AR") at 2927.) In July 2015, after A.S. finished first grade, L.C. contacted Leslie Lederman, the principal of A.S.'s school, and requested that A.S. be evaluated for special education services. (*Id.* at 2916-17.) Ms. Lederman informed L.C. that the guidance team would meet in September to discuss L.C.'s request and asked

that L.C. provide any outside information she wanted the team to consider. (*Id.* at 2916.)

L.C. subsequently arranged for A.S. to be privately evaluated by Linda Gorsuch, a retired

school psychologist. (*Id.* at 2931-47, 3635.)

Ms. Gorsuch met with L.C. and A.S. in August 2015. (*Id.* at 2931-32.) Ms.

Gorsuch conducted several assessments of A.S., including the Woodcock-Johnson IV test

of cognitive abilities. (*Id.* at 2936.) Ms. Gorsuch found that A.S.'s score for general

intellectual ability was within the average range. (*Id.* at 2943.) She also found that

A.S.'s "[b]road [r]eading" skills and oral "[r]eading [f]luency" scores were below

average. (*Id.*) Although Ms. Gorsuch did not formally diagnose A.S., Ms. Gorsuch

concluded that A.S. "demonstrated a pattern of academic and cognitive strengths and

weaknesses consistent with . . . the specific learning disability of dyslexia." (*Id.*) She

recommended that the District "initiate [its] own evaluation to determine [A.S.'s]

eligibility for special education services," including services in the areas of "written

language and math." (*Id.* at 2944.)

The guidance team from A.S.'s school met with L.C. and A.S.'s father, J.S.,

(collectively, "the Parents"), at the beginning of A.S.'s second grade year. (*Id.* at

2918-24.) At the meeting were Ms. Lederman; Sue Schoot, a special education teacher;

Stacie Schultz, a speech language pathologist; Devon Heras, a school psychologist; and

Jessica Clark, A.S.'s general education teacher. (*Id.* at 2953.) The guidance team

discussed the results of Ms. Gorsuch's evaluation and the Parents' concerns about A.S.'s

academic progress. (*Id.* at 2923.) The guidance team recommended that A.S. undergo an

//

initial evaluation to determine whether she was eligible for special education services. (*Id.* at 2925; *see also id.* at 2967.)

2. 2015 Special Education Evaluation

In October 2015, the evaluation team examined its existing data on A.S. and conducted several additional assessments. Ms. Heras, the school psychologist, reviewed A.S.'s progress in general education, focusing on prior standardized test scores, her first-grade report cards, and input from Ms. Clark, A.S.'s second-grade teacher. (*Id.* at 2967, 2969.) Ms. Heras also examined A.S.'s social-emotional functioning through ratings submitted by L.C. and Ms. Clark under the Behavior Assessment System for Children–Second Edition ("BASC-2"), a standardized assessment. (*Id.* at 2971.) A.S. did not exhibit any clinically significant behaviors under the BASC-2. (*Id.* at 2971-72.) In addition, Ms. Heras administered to A.S. the Differential Abilities Scale–Second Edition ("DAS-II"), a cognitive development test for school-age children. (*Id.* at 2974.) She concluded that A.S.'s cognitive functioning was in the average range. (*Id.* at 2973-75; *see also id.* at 4408 (showing that A.S.'s DAS-II verbal, nonverbal reasoning, spatial, and general conceptual abilities scores were all average).)

Separately, Ms. Schoot, the special education teacher, assessed A.S.'s academic performance in reading, writing, and math. (*Id.* at 2977.) Ms. Schoot administered the Kaufman Test of Educational Achievement–Third Edition ("KTEA-III"), which allowed Ms. Schoot to compare A.S.'s current academic performance with a national sample of her peers. (*Id.*) A.S. scored in the average range for all subjects, except for the reading composite and reading comprehension components, in which she obtained below-average

scores.  (*Id.*)  In summarizing A.S.'s KTEA-III assessment, the evaluation team stated that A.S. demonstrated "average basic reading skills but below average reading comprehension skills."  (*Id.* at 2978.)  The evaluation team thus recommended that A.S. "receive specially designed instruction in reading comprehension and reading fluency." (*Id.*)  The team also recommended that A.S. receive specially designed instruction in written expression.  (*Id.* at 2979.)

Additionally, Ms. Schultz, the speech language pathologist, assessed A.S.'s communication skills.  (*Id.* at 2980.)  Ms. Schultz administered two standardized evaluations:  (1) the Clinical Evaluation of Language Fundamentals–Fifth Edition ("CELF-5"), which helps identify language and communication disorders in students; and (2) the Goldman Fristoe Test of Articulation–Second Edition, which considers a child's ability to accurately produce a speech sound.  (*Id.*)  A.S. scored in the average range on both tests.  (*Id.*)  Ms. Schultz also obtained feedback about A.S.'s communication from A.S.'s teachers and observed A.S. in the classroom.  (*Id.* at 2981-82.)  In light of the standardized tests, her classroom observations, and teacher input, Ms. Schultz concluded that "[A.S.] does not demonstrate a disability in the area of communication at this time." (*Id.* at 2982.)

Finally, a District occupational therapist evaluated A.S.'s fine motor skills.  (*Id.* at 2983.)  The occupational therapist examined several writing samples Ms. Clark provided and administered to A.S. the Bruininks-Oseretsky Test of Motor Proficiency–2.  (*Id.* at 2984.)  She concluded that A.S.'s fine motor skills fell within the average range and did not recommend specialized instruction in that area.  (*Id.*)  Nonetheless, she suggested that

A.S. "be given accommodations such as lined paper for assignments and early access to keyboarding." (*Id.*)

Following these assessments, the District concluded that A.S. was eligible for special education services under the eligibility category of "Specific Learning Disability."[2] (*Id.* at 2961.) In particular, the evaluation team found that "[A.S.] is developing reading and written expression skills at a rate and level significantly below her same age peers[.]" (*Id.*) As a result, the team concluded that A.S. "qualifie[d] for specially designed instruction in the areas of reading and writing as well as supplementary aides and services to support her in the general education classroom." (*Id.*) The evaluation team further concluded that A.S. did not require specially designed instruction in the areas of math, communication, fine motor skills, or social-emotional functioning. (*Id.* at 2993.) Finally, the team recommended several specific accommodations for A.S., including, among other measures, preferential seating, oral test instruction, and access to a keyboard for written assignments. (*Id.* at 2968.) The District documented the initial evaluation in a written report. (*Id.* at 2960-94.)

On October 15, 2015, A.S.'s evaluation team met with the Parents to review A.S.'s initial evaluation. (*Id.* at 2993.) The evaluation team provided the Parents a copy of the draft evaluation report, which the Parents signed at the meeting. (*Id.* at 2964.) The Parents requested that A.S. undergo an assistive technology assessment, and the team agreed. (*Id.* at 2994.) The District later sent the Parents a prior written notice ("PWN")

---

[2] The IDEA recognizes "specific learning disabilit[y]" as a category of eligibility for special education services. 20 U.S.C. § 1401(3)(A)(i).

that summarized the meeting.  (*Id.* at 2993-94.)  The PWN indicated that, within 30 days, the District would hold a meeting with the Parents to formulate an IEP for A.S.  (*Id.*)

Shortly thereafter, the District conducted an "assessment revision" to determine whether A.S. would benefit from the use of assistive technology in the classroom.  (*Id.* at 3002.)  An assistive technology specialist evaluated A.S. using Co:Writer, a software program designed to help students write complete sentences.  (*Id.*)  The specialist recommended that A.S. be given access to a computer with word prediction, spelling support, and text-to-speech software when completing writing assignments.  (*Id.* at 3003.)

### 3. 2015 IEP

On November 5, 2015, A.S.'s entire IEP team met to discuss the assistive technology evaluation and A.S.'s IEP.  (*Id.* at 3005.)  The IEP team included Ms. Schoot, Ms. Clark, Ms. Heras, Ms. Lederman, Tara Slinn, the District's Director of Elementary Special Services, and the assistive technology specialist.  (*Id.* at 3008.)  L.C. was ill and did not attend, but J.S. was there.  (*Id.*; *see also* Tr. 489:11-15, 1844:6-15.[3])  After reviewing the assistive technology assessment, J.S. agreed that A.S. be given access to Co:Writer in the classroom.  (*Id.* 487:16-488:20.)  In addition, the team reviewed with J.S. a draft of A.S.'s IEP.  (*Id.* 1845:4-11).)

A.S.'s 2015 IEP began on November 5, 2015.  (AR at 3008.)  The IEP identified A.S.'s "[d]isability" category as "Specific Learning Disabilities."  (*Id.*)  In addition to

---

[3] The transcript from the due process hearing is found in Volume 1 through Volume 10 of the administrative record.  When citing the transcript, the court cites the page number at the bottom-right corner of the page and specifies the relevant line numbers.

summarizing the District's assessment of A.S., the IEP noted that "[A.S.'s] parents reported that [A.S.] has dyslexia and difficulty with language" and explained that Ms. Gorsuch had concluded that "[A.S.] demonstrated a pattern of academic and cognitive strengths and weaknesses consistent with . . . the specific learning disability of dyslexia." (*Id.* at 3011.)

The IEP also identified the special education services and accommodations A.S. required for the 2015-16 school year. Under the IEP, A.S. would receive specially designed instruction in reading for 20 minutes per day, five times per week, as well as specially designed instruction in writing for 20 minutes per day, five times per week. (*Id.* at 3026.) A.S. would spend the remainder of the school day in the general education setting. (*Id.*) Moreover, A.S. would receive the following accommodations: visual aids, a word processor or computer with word prediction and text-to-speech software, audiobooks, BrightLines paper, redirection to task as needed, preferential seating, extra time for writing assignments, modifications in homework and classwork, modified grades in content areas impacted by her disability, and certain testing accommodations. (*Id.* at 3023.) Finally, the IEP set four annual goals for A.S. in reading, reading comprehension, and writing. (*Id.* at 3020-21.) At the administrative hearing, Ms. Schoot and Ms. Clark testified that, during the 2015-16 school year, they consistently provided A.S. the accommodations required by her IEP. (*See, e.g.*, Tr. 720:15-724:4, 1850:13-1851:9.)

4. 2015-16 School Year

In mid-January 2016, L.C. contacted Ms. Lederman, the principal, and asked to schedule an "issue review" for A.S. (AR at 3038.) Specifically, L.C. stated that she had

concerns about A.S.'s "[IEP] goals and progress." (*Id.* at 3037.) On February 2, 2016, the Parents met with A.S.'s IEP team. (*Id.* at 3044-48.) At the meeting, L.C. expressed that she "fe[lt] as though [A.S.] [was] not making positive changes." (*Id.* at 3044.) In response, Ms. Schoot stated that A.S. was starting to self-correct as she read, that A.S.'s reading fluency was progressing, and that A.S.'s reading comprehension had improved. (*Id.* at 3044-45.) Ms. Schoot also stated that, in a period of just 40 days, A.S. had moved up two levels, from level "G" to level "I," in the District's Fountas & Pinell ("F&P") reading assessment program—a progression that typically developed over the course of 10 to 12 weeks. (*Id.* at 3044.) Similarly, Ms. Clark expressed that A.S. had made progress in the general education setting. (*Id.* at 3046.)

During the meeting, the Parents made, and A.S.'s IEP team considered, several requests related to A.S.'s IEP:

- The Parents asked that they be allowed to "drop in" during A.S.'s general education classes so that they could monitor A.S. (*Id.* at 3049.) The IEP team explained that, consistent with District policy, the Parents could schedule times to volunteer or visit but could not drop in at undesignated times because such visits would disrupt the learning environment. (*Id.* at 3050.)

- The Parents requested that the District reassess A.S.'s communication skills. (*Id.*) The IEP team explained that, given the results of the initial evaluation of a few months earlier, A.S. did not qualify for specially designed instruction in communication; however, Ms. Heras stated that Ms. Schultz, the speech language pathologist, would contact the Parents about the request. (*Id.*)

- The Parents requested that A.S. receive full-time, one-on-one support in the special education classroom. (*Id.* at 3049.) The IEP team discussed this request and concluded that, because A.S. was benefitting from small-group instruction, one-on-one instruction was unnecessary and "too restrictive." (*Id.* at 3050.)

- The Parents requested that A.S. work with a tutor over the summer break. (*Id.* at 3049.) Ms. Lederman explained that, later in the school year, the District would share with all parents information about fee-based summer instruction. (*Id.* at 3050.)

- The Parents requested that A.S. be required to use Co:Writer at all times. (*Id.* at 3049.) The IEP team explained that they would encourage A.S. to use Co:Writer but could not force her to do so. (*Id.* at 3050.)

- The Parents requested that, when a substitute was present in Ms. Clark's classroom, A.S. spend the entire day in the special education classroom or a different general education teacher's classroom. (*Id.* at 3049.) The IEP team discussed this request but denied it, reasoning that "[i]t [was] important that [A.S.] be with her peers in a least restrictive environment." (*Id.* at 3050.) For the same reasons, the IEP team denied the Parents' request that A.S. remain in the general education classroom whenever a substitute was teaching on Ms. Schoot's behalf. (*Id.*)

- The IEP team considered and denied the Parents' requests that L.C. be allowed to work with A.S. in the special education classroom, that A.S.'s teachers not

correct her work, and that L.C. be allowed to read with A.S. in the general education classroom five days per week. (*Id.*)

- The Parents requested that Ms. Schoot and Ms. Clark be trained in the Orton-Gillingham Approach to reading instruction. (*Id.* at 3049.) The IEP team explained that school staff would "utiliz[e] the curricula and methodologies as trained by the District"; however, Ms. Schoot agreed to review an Orton-Gillingham manual. (*Id.* at 3050).

- The IEP team agreed that A.S. would be given a BrightLines notebook to use at home, that A.S. would not participate in state or district standardized testing, that Ms. Clark would encourage A.S. to use Co:Writer in the general education classroom, that A.S. would not be provided crossword or scrambled puzzles, and that A.S. would not work with parent volunteers in the general education classroom. (*Id.* at 3051.)

- Finally, the IEP team agreed to allow L.C. to schedule a time to speak to A.S.'s classmates about dyslexia. (*Id.*)

The IEP team memorialized the Parents' requests in a PWN. (*Id.* at 3049-51.) The Parents did not request another IEP meeting during the 2015-16 academic year. (Tr. 1859:2-5.) During that time, the District provided the Parents reports on A.S.'s progress toward her annual IEP goals. (AR at 3030-34.)

5. 2016 IEP

Soon after the 2015-16 school year ended, L.C. wrote Ms. Lederman and requested that the District hold another IEP team meeting "ASAP" because she did not

want A.S. to wait until October or November to receive "help." (*Id.* at 3055.) Ms. Lederman responded that, although A.S.'s IEP review would occur after the school year started, A.S. would still receive IEP services in September. (*Id.*) A few days later, the Parents e-mailed the District Superintendent, Ron Thiele, and other District personnel. (*Id.* at 3054.) The Parents stated that they "ha[d] been unsuccessful in resolving [a] dispute" with A.S.'s school "concerning [A.S.'s] IEP and her placement" and requested mediation services before the beginning of the school year. (*Id.*) In response, Melissa Madsen, the District's Executive Director of Special Services, sent the Parents the contact information for Sound Options Group, which could provide mediation at no cost to the Parents. (*Id.* at 3053.) After speaking with Sound Options, L.C. informed the District that they wished to take part in a facilitated IEP team meeting before the school year began. (*Id.*)

The Parents met with A.S.'s IEP team on August 31, 2016. (*Id.* at 3068, 3327.) A Sound Options facilitator participated in the meeting. (*Id.* at 3068.) The IEP team agreed to take new baseline data on A.S. and prepare revised IEP goals at the beginning of the school year. (Tr. at 1639:1-6, 1835:17-23; AR at 3076, 3079, 3327-41.) After the meeting, L.C. emailed Mr. Thiele and reported that the Parents were satisfied with the meeting. (*Id.* at 3062.) In fact, L.C. expressed that meeting was "fabulous" and stated that, "[f]or the first time in three years," she had "hope for [A.S.] and the school year." (*Id.*)

On October 27, 2016, the District convened an IEP meeting between the Parents and A.S.'s IEP team. (*Id.* at 3087.) Prior to the meeting, the District sent the Parents a

draft IEP for the Parents' review. (Tr. 1860:21-1861:13.) At the meeting were the Parents; Ms. Lederman; Ms. Schoot; Ms. Madsen; Ms. Heras; Ms. Slinn; Christina Desmond, a speech language pathologist; and Amy Van de Vord, A.S.'s third grade general education teacher. (AR at 3089.) The IEP team discussed with the Parents A.S.'s educational performance and progress toward her 2015 IEP goals. (*Id.* at 3104-11.) That information was also memorialized in the IEP. (*Id.* at 3089-101.)

The IEP team addressed in detail A.S.'s educational performance in reading, writing, and math. (*See id.*) With respect to reading, the IEP team noted that, as of October 2016, A.S. was reading at an instructional level "J," as measured by the F&P curriculum. (*Id.* at 3091.) A.S. had thus improved several instructional levels since the 2015 initial assessment, when she was reading at an instructional level "G," but still did not meet the grade-level expectation to read between instructional levels "M" and "O." (*Id.*) With respect to writing, the IEP team noted that A.S. wrote stories quickly but struggled with spelling, punctuation, and capitalization. (*Id.*) Ms. Van de Vord observed that A.S. used Co:Writer to support her spelling, but Co:Writer "sometimes interrupt[ed] her thought process." (*Id.*) With respect to math, the IEP team stated that, when A.S. worked independently, she was often unable to correctly read or work through multi-step math problems without support. (*Id.*) Separately, Ms. Van de Vord stated that A.S. is a good listener, "very sweet and kind to her peers," and "not shy to participate." (*Id.* at 3092.)

The IEP team also documented A.S.'s progress toward her 2015 IEP goals. (*Id.* at 3092-93.) Ms. Schoot explained that, as of October 2016, A.S. could correctly read 94%

of the words at an instructional level "J." (*Id.* at 3092.) Accordingly, A.S. had not met her 2015 IEP goal to improve her reading accuracy from 94% to 98%; however, she had progressed to a more advanced reading level without sacrificing accuracy. (*Id.*) Ms. Schoot also noted that A.S. could correctly answer eight of 12 reading comprehension questions at the second-grade level and 13 of 20 questions at the third-grade level. (*Id.* at 3092-93.) A.S. had thus progressed toward, but ultimately fallen short of, her 2015 goal to correctly answer 83% of a set of third-grade level reading comprehension questions. (*Id.* at 3092.) In writing, Ms. Schoot explained that A.S. could now write topic sentences but continued to work toward writing paragraphs with supporting sentences and a conclusion. (*Id.* at 3093.) As a result, A.S. had yet to meet her 2015 goal of writing four grade-appropriate sentences. (*Id.*) Finally, Ms. Schoot noted that, when using a computer with teacher support, A.S. used correct punctuation in her writing assignments 50% of the time. (*Id.*) According to Ms. Schoot, A.S. had thus satisfied her 2015 goal to increase her punctuation accuracy from 0% to 50%; however, the 2015 IEP goal does not indicate that it would be measured by A.S.'s work with teacher support. (*Id.*; *see also id.* at 3021.) In sum, A.S. had either met or progressed toward all four of her 2015 IEP goals.

Moreover, the 2016 IEP identified A.S.'s accommodations and modifications for the 2016-17 school year. (*Id.* at 3097-98.) With respect to accommodations, the IEP required that A.S. have daily access to audiobooks in the general education classroom, daily use of BrightLines paper in all classrooms, daily use of visuals in all classrooms, additional time to complete tasks in all classrooms, and an electronic or adult reader to

read text that did not measure reading ability. (*Id.* at 3097.) In addition, A.S.'s general education teacher was to provide A.S. preferential seating and read aloud to A.S. any materials and tests "to verify [A.S.] kn[ew] what[] [was] expected of her." (*Id.*) With respect to modifications, A.S.'s general education teacher was to refrain from correcting A.S.'s work in writing and was not to ask A.S. to read aloud in a large group, among other measures. (*Id.* at 3097-98.) Finally, the 2016 IEP provided that A.S. would undergo 30 minutes per day of specially designed instruction in reading and 30 minutes per day of specially designed instruction in writing, an increase of 10 minutes per day in each subject. (*Id.* at 3100; *see also id.* at 3026.) The 2016 IEP also set new goals in reading and writing. (*Id.* at 3092-93.)

Additionally, at the October 27, 2016, IEP meeting, the Parents made, and the IEP team considered, several specific requests concerning A.S.'s IEP. (*Id.* at 3102-03.) Specifically:

- The Parents requested that the District reassess A.S. in math to determine whether she qualified for specially designed instruction in that area. (*Id.* at 3103.) The IEP team agreed. (*Id.*; *id.* at 3107.)

- The Parents requested that the District reassess A.S. in communication. (*Id.* at 3102.) The IEP team discussed the request but decided a communication reassessment was not warranted "because previous testing by the School District was strong and valid" and "[t]here [was] no reason to believe that [A.S.'s] scores would drop significantly enough to qualify her for speech/language services." (*Id.* at 3103, 3108.)

- The Parents asked that the District change A.S.'s IDEA disability category from "Specific Learning Disability" to "Dyslexia." (*Id.* at 3102.) The IEP team rejected the request, explaining that "Dyslexia" is not a qualifying disability category. (*Id.*)

- The Parents requested that A.S. be "reevaluated by district specialists" outside of her elementary school. (*Id.*) The IEP team rejected the request because the school personnel who had evaluated A.S. did so in accordance with District training on the administration of standardized assessments. (*Id.* at 3103.)

- The Parents requested that A.S. receive extended school year ("ESY") services. (*Id.* at 3102.) The IEP team rejected this request because the District makes decisions regarding ESY in the spring and "there [was] no data to suggest that [A.S.] require[d] the service at [that] time." (*Id.* at 3103.)

- The Parents requested that A.S. receive one-on-one support in the general education classroom. (*Id.* at 3102.) The team rejected the request because "[t]here was . . . no data" to suggest that A.S. required such assistance and explained that "interventions in the classroom should be implemented before making such a decision." (*Id.* at 3103.)

- The Parents requested that the District inform them of the credentials of the educational assistants who support students in the special education classroom. (*Id.* at 3102.) The IEP assured the Parents that the educational assistants were properly qualified and trained but stated that the District "is not at liberty to share the qualifications of staff members to parents." (*Id.* at 3103.)

- The Parents requested that A.S.'s IEP be revised to require the District to instruct A.S. through the Orton-Gillingham method. (*Id.* at 3102.) The IEP team rejected the request on the ground that "[t]he District does not identify specific programs in the IEP goals." (*Id.* at 3103.)

At the end of the October 27, 2016, IEP meeting, the Parents signed the IEP but indicated that they did not agree with the IEP. (*Id.* at 3089 (showing that L.C. wrote "dissent" next to her signature and J.S. wrote "not agree fully" next to his).) The District provided the Parents a PWN, dated November 4, 2016, which proposed to implement the IEP on November 8, 2016. (*Id.* at 3102-03.) The PWN also memorialized the Parents' requests and the District's reasons for declining to implement those requests. (*Id.*)

6. 2016 Assessment Revision in Math

The District reevaluated A.S. in math in November 2016. (*Id.* at 3626.) In doing so, the District reviewed A.S.'s performance on District standardized tests in the first and second grades. (*Id.* at 3626-27.) The District also obtained feedback from A.S.'s general education teacher, Ms. Van de Vord, who reported that A.S. was "performing below average in the area of math." (*Id.* at 3627.) In addition, the District re-administered the KTEA-3. (*Id.* at 3628.) A.S. scored in the 27th percentile in the math composite, which was in the average range; the 53rd percentile in math concepts and applications, which was in the average range; and the 14th percentile in math computation, which was below average. (*Id.*) The District documented A.S.'s math reassessment in a written report. (*Id.* at 3626-30.)

//

The District invited the Parents to discuss the results of A.S.'s math reassessment by phone, e-mail, and letter, but the Parents declined. (*Id.* at 3116-17.) On November 29, 2016, A.S.'s IEP team met without the Parents and determined that, "[g]iven the results of the KTEA-3, progress in her general education class, performance on district-wide assessments, performance on curriculum based measures, and [the] input of her teacher," A.S. did not qualify for specially designed math instruction at that time. (*Id.* at 3121.) Specifically, the IEP team noted that A.S.'s cognitive scores were "not severely discrepant" from her KTEA-3 scores in November 2016, "indicating that she does not have a Specific Learning Disability in math." (*Id.*) A.S.'s IEP team concluded that A.S.'s math needs could be satisfied through accommodations in the general education setting. (*Id.*) The District identified potential accommodations in a December 1, 2016, PWN, which documented the November 29, 2016, meeting, and sent the PWN to the Parents. (*Id.* at 3632-33; *see also* Tr. 1870:12-21.) The Parents declined to amend the 2016 IEP to reflect the proposed accommodations. (Tr. 1870:21-25.)

7. The District's and the Parents' Due Process Hearing Requests

A few hours after the October 27, 2016, IEP meeting, the Parents requested that the District provide an independent education evaluation ("IEE") of A.S. at the District's expense.[4] (AR at 3114-15.) In an email to A.S.'s IEP team, L.C. explained that the Parents sought the IEE for two reasons: she alleged that the District "[was] refusing to allow [A.S.] to be tested or to be given services based on her language," and she alleged

---

[4] An IEE is an evaluation conducted by a qualified examiner who is not employed by the student's school district. *See* 34 C.F.R. § 300.502(a)(3)(i).

that the District "[was] refusing to differentiate A.S.'s disability by giving her an individualized treatment plan." (*Id.* at 3115.) The District subsequently filed a request with the Office of Superintendent of Public Instruction ("OSPI") for an administrative hearing to demonstrate that the District was not obligated to fund an IEE because A.S.'s 2015 initial evaluation was appropriate.[5] (*Id.* at 2635-38; *see also* Tr. 1447:5-12.) OSPI forwarded the District's due process hearing request to the state Office of Administrative Hearings.

Shortly thereafter, the Parents filed a due process hearing request, alleging that the District denied A.S. a FAPE during the 2015-16 and 2016-17 school years. (AR at 2904-07.) In addition, the Parents alleged that the District had failed to adequately reassess A.S. in math in November 2016 and requested that the District fund a second IEE. (*Id.* at 2594.) The District amended its hearing request to reflect the Parents' disagreement with the 2016 math reassessment. (*Id.*) The Office of Administrative Hearings consolidated the Parents' and the District's due process hearing requests. (*Id.* at 2593.) The matter was assigned to the ALJ. (*See id.* at 2624.)

C.     **The Administrative Hearing**

1. <u>Prehearing Matters</u>

The ALJ held several prehearing conferences to discuss the Parents' discovery requests and define the issues for the hearing. (*See id.* at 2453-64, 2498-04, 2539-55, 2593-606.) On February 2, 2017, the ALJ issued a prehearing order that identified four

---

[5] If a school district disagrees with a parent's request that the district fund an IEE, the district must file a request for a due process hearing to show that its own evaluation is appropriate. *See* 34 C.F.R. § 300.502(b)(2).

issues for the hearing.  (*Id.* at 2560-63.)  First, the ALJ was to determine whether the

District denied A.S. a FAPE by, among other things, failing to develop or implement

appropriate IEPs.  (*Id.* at 2460-62.)  Second, the ALJ was to determine whether the

District appropriately evaluated A.S. in 2015, and, if not, whether the District should pay

for an IEE.  (*Id.* at 2463.)  Third, the ALJ was to determine whether the District

appropriately reassessed A.S. in math in November 2016, and, if not, whether the District

should pay for an IEE.  (*Id.*)  Finally, the ALJ was to determine whether the Parents were

entitled to their requested remedies, which included training in the Orton-Gillingham

method for school staff who worked with A.S. and payment of A.S.'s tuition at a school

that specializes in teaching children with dyslexia.[6]  (*Id.* at 2462-63.)

### 2. The Hearing

The hearing began on March 17, 2017.  Although the hearing was originally

scheduled for five days (*see id.* at 2445), the ALJ heard testimony over the course of 10

days (*see id.* at 2641).  In total, the parties called 11 witnesses:  A.S.; J.S.; Ms. Clark; Ms.

Madsen; Ms. Schoot; Ms. Heras; Ms. Slinn; Ms. Van de Vord; Ms. Desmond; Shelly Fry,

a District assessment specialist; and Cheryl Anthony, the Parents' expert witness.  (*Id.* at

2642.)

The ALJ heard extensive testimony from Ms. Anthony.  (*See* Tr.

1491:14-1601:15.)  Ms. Anthony has a master's degree in education, a Washington State

teacher certification with a K-12 reading endorsement, and "training in assessing

---

[6] Since September 2017, A.S. has attended a school that specializes in teaching children
with dyslexia.  (L.C. MSJ at 4.)

dyslexia." (AR at 5068.)  She is president of Successful Learning Educational Services, LLC, "an educational service business providing screening for dyslexia and dysgraphia, and direct services" in specific subject areas.  (*Id.*)  Ms. Anthony does not hold a special education endorsement and did not personally assess A.S.  (Tr. 1569:7-13, 1571:9-10, 1582:6-16.)

Ms. Anthony offered several opinions at the hearing.  First, Ms. Anthony testified that she "would say" that A.S. has "severe to profound" dyslexia.  (*Id.* 1503:14-16; *see also id.* 1573:19-1574:5.)  Ms. Anthony acknowledged, however, that she was not qualified to diagnose A.S. and primarily based her opinion upon her understanding that Ms. Gorsuch had diagnosed A.S. with dyslexia.  (*Id.* 1574:7-9, 1575:17-20.)  Ms. Anthony also opined that A.S. did not receive a FAPE in the 2015-16 school year because her IEP goals were targeted to "fluency and reading comprehension skills without addressing the foundation that has to be in place for those other goals to be met." (*Id.* 1595:14-20.)  Similarly, Ms. Anthony opined that A.S. did not receive a FAPE in the 2016-17 school year because some of her IEP goals "were unattainable for a person who struggles the way that [A.S.] struggles" and did not address her foundational needs.  (*Id.* 1596:11-19.)

3.  The ALJ's Decision

On June 14, 2017, the ALJ issued her Findings of Fact, Conclusions of Law, and Order.  (AR at 2641-2678 ("ALJ Order").[7])  The ALJ concluded that the District satisfied

_____

[7] When citing the ALJ's order, the court specifies whether it refers to the ALJ's findings of fact ("FF") or conclusions of law ("CL"), followed by the relevant paragraph number.  Where

its burden to show that the District appropriately evaluated A.S. in 2015 and in 2016, and that the Parents were therefore not entitled to IEEs at the District's expense.  (*Id.* CL ¶¶ 21-23.)  In addition, the ALJ concluded that the Parents failed to prove that the District denied A.S. a FAPE in 2015 or 2016.  (*Id.* CL ¶¶ 36-67.)  The ALJ thus denied the Parents' requested remedies.  (*See id.* at 38.)

**D.  Procedural History**

The Parents filed a petition for judicial review of the ALJ's decision.[8]  (Compl. (Dkt. # 6).)  In the complaint, the Parents named as Defendants Mr. Thiele, the District Superintendent, and Ms. Madsen, District's Executive Director of Special Services.  (*Id.* at 1.)  Neither Mr. Thiele nor Ms. Madsen were defendants in the administrative hearing. Additionally, the Parents sought leave to amend their complaint to add three other individuals—Ms. Lederman, Ms. Schoot, and Ms. Heras—as Defendants.  (11/28/17 Mot. to Am. (Dkt. # 22) at 2.)  The court denied the Parents' motion to amend and dismissed Mr. Thiele and Ms. Madsen as individual Defendants on the ground that the IDEA does not provide for individual liability.  (3/28/18 Order (Dkt. # 42).)  The Parents subsequently moved for reconsideration of the court's decision to dismiss Mr. Thiele and Ms. Madsen.  (1st MFR (Dkt. # 51); 2d MFR (Dkt. # 56).)  The court denied the Parents' motions for reconsideration.  (*See* Min. Entry (Dkt. # 60).)

//

---

no paragraph number corresponds to the cited material, the court cites the page number of the ALJ's order.

[8] J.S. has since withdrawn from the appeal.  (Mot. to Withdraw (Dkt. # 62); 3/29/19 Order (Dkt. # 63).)

L.C.'s motion for summary judgment challenges both: (1) the ALJ's conclusion that the District carried its burden to show that the Parents were not entitled to an IEE at public expense; and (2) the ALJ's conclusion that the Parents failed to carry their burden to show that the District denied A.S. a FAPE in the 2015-16 or 2016-17 school year. (*See generally* L.C. MSJ.) The District contends that the court should affirm the ALJ's order in its entirety. (*See generally* Dist. MSJ.)

The court now considers the motions.

### III.    ANALYSIS

**A.    Motion to Amend Complaint**

While the parties' cross-motions for summary judgment were pending, L.C. filed a motion to amend the complaint. (*See* Mot. to Am.) L.C. represents that she seeks to amend the complaint to "correct inadvertent omissions," "include new claims [for] relief," and "amend the parties involved," among other reasons. (*Id.* at 3.) She also argues that leave to amend is appropriate under Federal Rule of Civil Procedure 15. (*Id.* at 3); *see also* Fed. R. Civ. P. 15. Alongside her motion, L.C. filed a 54-page proposed "Amended . . . Complaint Brief" and several pages of additional materials. (*See* Mot. to Am. at 6-86.) Those materials include declarations signed by non-party parents whose children attended school in the District. (*See id.* at 80-86.) The District opposes L.C.'s motion. (Mot. to Am. Resp. (Dkt. # 65).)

Although L.C. states that she seeks to amend the complaint, the motion is in substance a motion for leave to file an amended motion for summary judgment. (*See* Mot. to Am. at 6-60.) Federal Rule of Civil Procedure 15 governs the amendment of

pleadings, not motions.  *See* Fed. R. Civ. P. 15.  The court thus does not reach L.C.'s

arguments under Rule 15.  In any event, the court finds that L.C. is not entitled to leave to

amend her motion for summary judgment.  The issues before the court are fully briefed,

and L.C. does not explain why she should be allowed to revise her summary judgment

motion at this late hour.  (*See generally* Mot. to Am.)  Moreover, in administrative

appeals under the IDEA, the court may consider "additional evidence" outside the

administrative record only if that evidence is "non-cumulative, relevant, and otherwise

admissible."  *See E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1005 (9th Cir.

2011); *see also* 20 U.S.C. § 1415(i)(2)(C)(ii).  The non-party parents' declarations reveal

nothing about whether the District upheld its IDEA obligations in A.S.'s case and are

thus not relevant to L.C.'s appeal.  Accordingly, the court DENIES L.C.'s motion to

amend the complaint, which the court construes as a motion to amend her summary

judgment motion.

**B.  Standard of Review**

   In an appeal from a due process hearing under the IDEA, the court:  "(i) shall

receive the records of the administrative proceedings; (ii) shall hear additional evidence

at the request of a party; and (iii) basing its decision on the preponderance of the

evidence, shall grant such relief as the court determines is appropriate."[9]  20 U.S.C.

---

[9] As a practical matter, parties often file cross-motions for "summary judgment" on IDEA
appeals.  *See Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891-92 (9th Cir. 1995).
Although parties may caption their dispositive motions as motions for summary judgment, an
IDEA suit "is in substance an appeal from an administrative determination."  *Id.* at 892.
Accordingly, in IDEA appeals, the court does not apply the typical summary judgment standard
and "may—indeed, in some cases must—review and decide genuine issues of material fact by a
preponderance [of the evidence] based on evidence in the record and any additional evidence

§ 1415(i)(2)(C).  The burden of persuasion rests with the party challenging the administrative decision.  *Fresno Unified*, 626 F.3d at 438.  Under the standard of review described in the IDEA, "complete de novo review of the administrative proceeding is inappropriate."  *Id.* (quoting *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007)).  Nonetheless, the court gives "less deference [under the IDEA] than is conventional in review of other agency actions."  *Fresno Unified*, 626 F.3d at 438 (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)).

"How much deference to give state educational agencies . . . is a matter for the discretion of the courts."  *Fresno Unified*, 626 F.3d at 438 (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)) (emphasis omitted).  The court gives "particular deference" to the ALJ's administrative findings where those findings are "'thorough and careful.'"  *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).  An ALJ's findings are "thorough and careful" when the ALJ "participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions."  *Napa Valley Unified*, 496 F.3d at 942.  Whatever deference the ALJ's findings are due, "courts should not substitute their own notions of sound educational policy for those of the school authorities which they review."  *Gregory K.*, 811 F.2d at 1311 (quoting *Wilson v. Marana Unified Sch. Dist.*, 735 F.2d 1178, 1183 (9th Cir. 1984)).

---

offered by the parties, in addition to the findings of the ALJ."  *J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1184 (W.D. Wash. 2002).

**C.    L.C.'s Appeal**

L.C. alleges that the ALJ's decision is deficient on numerous grounds.  Her arguments fall into three categories:  (1) the ALJ's decision was the result of an unfair hearing process and should not be afforded deference; (2) the ALJ erroneously found that A.S.'s 2015 initial evaluation and 2016 math reevaluation were appropriate, such that the District was not required to provide IEEs; and (3) the ALJ erroneously found that the District did not deny A.S. a FAPE in the 2015-16 and 2016-17 school years.  The court addresses L.C.'s arguments in turn.[10]

1.    The Hearing Process and Deference to the ALJ's Order

L.C. asserts several claims related to the ALJ's conduct of the hearing and broadly argues that the ALJ "violated the Parent[s'] right to a fair trial."  (L.C. MSJ at 14-17.)  Her arguments concern the ALJ's refusal to rule on claims not pleaded in the due process complaint; the ALJ's rulings on the exclusion and sequestration of certain witnesses; the weight the ALJ accorded Ms. Anthony's testimony; and other evidentiary issues.  (*See id.*)  As discussed below, several of L.C.'s arguments regarding the hearing process relate to the degree of deference, if any, the court should afford the ALJ's findings and conclusions.

//

---

[10] Because L.C. proceeds *pro se*, the court liberally construes her motion.  *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 698-99 (9th Cir. 1990).  Where L.C. has not cited relevant portions of the record or applicable authority, however, the court does not find or supply evidence on L.C.'s behalf.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

*a. Claims Not Pleaded in the Due Process Complaint*

L.C. asserts that the ALJ erroneously precluded the Parents from raising new

issues "that were discovered during the course of the hearing." (*Id.* at 15.)  Specifically,

L.C. alleges that the ALJ should have allowed the Parents to argue that the District

committed "educational malpractice," that Ms. Heras misrepresented herself as a

psychologist and committed perjury, and that the District fraudulently accepted federal

funds. (*Id.*; *see also* ALJ CL ¶ 67.)  The ALJ declined to consider these claims because

they "were not set forth in the [due process] [c]omplaint or in the issues statement and

because the ALJ lack[ed] jurisdiction for many of them." (*Id.*)  In addition, L.C. asserts

that the District failed to uphold its "child find" obligation under the IDEA, which

requires school districts to "identif[y], locat[e], and evaluat[e]" all students with

disabilities, while A.S. was in kindergarten and first grade. *See* 20 U.S.C.

§ 1412(a)(3)(A); (L.C. MSJ at 25-26).  The ALJ admitted evidence concerning A.S.'s

performance in kindergarten and first grade for the limited purpose of contextualizing the

claims the Parents pleaded in the due process complaint and did not rule on any claims

that arose before A.S.'s second-grade year. (*See, e.g.*, Tr. 45:4-24, 55:15-56:18,

284:19-285:5, 305:18-306:10.)  According to L.C., by refusing to consider these issues,

the ALJ contravened the Ninth Circuit's decision in *M.C. v. Antelope Valley Union High

School District*, 858 F.3d 1189 (9th Cir. 2017).

The ALJ properly declined to entertain claims not pleaded in the Parents' due

process complaint.  Administrative and judicial review in IDEA cases is specifically

limited to the issues raised in the due process complaint, unless the parties agree

otherwise.  *See* 20 U.S.C. § 1415(f)(3)(B); *see also Cty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1465 (9th Cir. 1996).  L.C. did not allege in the due process complaint that the District committed "educational malpractice," that Ms. Heras misrepresented her credentials, or that the District committed fraud (*see generally* AR at 2901-03); she raised these claims for the first time in the Parents' post-hearing brief (*id.* at 2730-34, 2783, 2786).  Additionally, L.C. cites no evidence that the parties agreed to expand the scope of the due process hearing to address these additional claims.  (*See generally* L.C. MSJ.)

Likewise, even if the due process complaint could be construed to allege that the District failed to uphold its child-find obligation before A.S.'s second-grade year, L.C. waived her right to bring that claim as part of the due process hearing.  The ALJ's initial statement of the issues for the hearing included only allegations relating to the 2015-16 and 2016-17 school years.  (*See id.* at 2564-66.)  Subsequently, the ALJ granted L.C. leave to amend the Parents' due process complaint.  (*See id.* at 2499-503, 2531-37.)  In the amended due process complaint, the Parents articulated additional issues for the hearing but did not assert that the District had failed to uphold its child-find duty before the 2015-16 school year.  (*See id.*)  L.C. cannot now argue, for the first time, that the District failed to comply with the IDEA while A.S. was in kindergarten and first grade. *See* 20 U.S.C. § 1415(f)(3)(B).

Finally, L.C.'s reliance on *Antelope Valley*, 858 F.3d 1189, is misplaced.  In that case, the Ninth Circuit reversed the district court's determination that the parents waived their right to raise a claim that the ALJ had omitted from the pre-hearing restatement of

the issues, even though the parents had pleaded the claim in their complaint. *Id.* at 1196.

In so holding, the Ninth Circuit emphasized that, just as in judicial proceedings, an

administrative tribunal must "treat issues as if they were raised in the complaint if they

are tried by consent." *Id.* Both sides in *Antelope Valley* "presented extensive evidence,"

including witness testimony, regarding the omitted claim. *Id.* Here, in contrast, L.C.

fails to show that any of the claims allegedly overlooked by the ALJ were tried by

consent. (*See generally* L.C. MSJ.) Indeed, the District consistently objected that

evidence about A.S.'s kindergarten and first-grade years was outside the scope of the

hearing, and the ALJ acknowledged as much. (*See, e.g.*, Tr. 45:4-24, 55:15-56:18,

284:19-285:5, 305:18-306:10.) The court thus finds that the ALJ properly declined to

rule upon the Parents' claims regarding "educational malpractice," perjury and

misrepresentation, fraud, and the District's alleged violation of the child-find obligation.

### b. *Witness Exclusion and Sequestration*

L.C. disputes the ALJ's rulings on two witness-related issues. First, she argues

that the ALJ erroneously precluded the Parents from calling Mr. Thiele, the District

Superintendent, "thereby dismissing the Parents' right to present evidence and

argument." (L.C. MSJ at 16.) L.C. alleges that Mr. Thiele "would have shown the

willful policy of negligence [the District] had in refusing to test for and teach dyslexic

children." (*Id.* at 16-17.) Second, L.C. contends that the ALJ erroneously failed to

sequester Ms. Madsen, the District's Director of Special Services. (*Id.* at 17.)

Before the hearing, the District moved to exclude Mr. Thiele on the ground that

Mr. Thiele lacked personal knowledge of A.S.'s academic performance and did not

participate in A.S.'s evaluation or IEP team meetings. (AR at 2413-14.) The Parents opposed the District's motion, arguing that, as Superintendent, Mr. Thiele was responsible for the District's alleged failure to provide A.S. a FAPE. (*Id.* at 2406-07.) After a telephonic hearing, the ALJ granted the District's motion to exclude Mr. Thiele. (*Id.* at 2400.) The court lacks a transcript of the telephonic hearing, and, in the pretrial order memorializing the hearing, the ALJ did not explain why she granted the District's motion. (*See id.* at 2400-02.) Nonetheless, the record sheds some light on the ALJ's reasoning. During the hearing, in response to L.C.'s request that the ALJ clarify her decision to exclude Mr. Thiele, the ALJ stated that she so ruled "based on what [she] heard" from the parties during the pretrial hearing. (Tr. 274:11-19.) The ALJ further explained that she would "reconsider" her ruling only if the Parents could provide testimony that Mr. Thiele "had somehow been involved in the selection of assessments" for the District. (*Id.*) The District asserts, and L.C. does not dispute, that the Parents declined to move for reconsideration of the ALJ's decision to exclude Mr. Thiele during the remainder of the hearing. (Dist. MSJ at 20; *see generally* L.C. MSJ; *see generally* L.C. Reply (Dkt. # 45).)

Because the District's motion to exclude Mr. Thiele appears to have been resolved by way of an oral ruling at a telephonic conference for which the court lacks a transcript, the court cannot evaluate the reasoning underlying the ALJ's decision. The court thus extends no deference to the ALJ's ruling on this point. Nonetheless, the court finds that, in light of the parties' submissions on the District's motion, the ALJ properly excluded Mr. Thiele. In opposing the District's motion, the Parents did not contest that Mr. Thiele

had no personal knowledge of A.S.'s disability, academic performance, evaluations, or IEPs. (*See* AR at 2406-07.) Nor did the Parents allege that Mr. Thiele's testimony would shed light on the District's alleged "negligence" with respect to students with dyslexia. (*Id.*) Moreover, the ALJ allowed the Parents to introduce L.C.'s email exchanges with Mr. Thiele. (*Id.* at 2400, 4277-315.) In those emails, Mr. Thiele repeatedly informed L.C. that "the appropriate place to address [her] concerns regarding [her] daughter's IEP [wa]s through the IEP team . . . and [the District's] Special Services Department." (*Id.* at 4287, 4288.) In other words, the Parents' own evidence tends to show that Mr. Thiele lacked personal knowledge of, and was not involved with, the District's assessment of A.S. or A.S.'s IEP. (*See generally id.* at 4277-315.) The ALJ thus properly granted to District's motion to exclude Mr. Thiele.

L.C. also argues that the ALJ erred in allowing Ms. Madsen to observe other witnesses' testimony before she took the stand. (L.C. MSJ at 17.) L.C. asserts that, because Ms. Madsen was not sequestered before her testimony, Ms. Madsen "knew what evidence [L.C.] was talking about and knew [L.C.'s] direct examination strategy." (*Id.*) Thus, according to L.C., she was precluded from obtaining "true and new testimony" from Ms. Madsen. (*Id.*) L.C.'s objections are unfounded. The ALJ properly ruled that Ms. Madsen was a party representative who was entitled to be present for other testimony. (*See* Tr. 503:18-505:10.) In any case, L.C. fails to show that the Parents suffered any prejudice as a result of the ALJ's refusal to sequester Ms. Madsen. (*See generally* L.C. MSJ.)

//

### c. The Parents' Expert

L.C. argues at length that the ALJ erroneously discounted the testimony of Ms. Anthony, the Parents' expert witness. (*See* L.C. MSJ at 22-25; *see also id.* at 17, 39.) The ALJ's decision summarized in detail the opinions Ms. Anthony provided at the hearing, including her view that the District denied A.S. a FAPE in the 2015-16 and 2016-17 school years. (*See* ALJ FF ¶¶ 83-89.) However, the ALJ concluded that, "[b]ecause Ms. Anthony does not have education, training, and experience in special education, has little experience writing IEP goals, has not met the Student or talked to her teachers, and has only reviewed samples of the Student's work provided by the Parents without an understanding of what the samples represented, her opinion is given little weight." (*Id.* FF ¶ 83.)

Courts have repeatedly recognized that an ALJ appropriately discounts an expert's testimony where the expert has not directly observed the student in an educational setting. *See, e.g.*, *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1212 (9th Cir. 2008) (concluding that the ALJ reasonably discounted the testimony of the parents' experts because those experts "based their opinions predominantly upon file reviews," in contrast to teachers who "had observed [the student's] school performance"); *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 611 F. Supp. 2d 1097, 1114 (E.D. Cal. 2009) (finding that the ALJ properly placed greater weight on teacher testimony than on that of an expert who "never met with [the student] or [d]istrict teachers and staff who worked with [the student]," "never observed [the student's] physical environment or his behavior," and based her opinion "solely on her review of the written IEPs, progress reports, and

examination results"); *B.V. v. Dep't of Educ., State of Haw.*, 451 F. Supp. 2d 1113, 1125-26 n.18 (D. Haw. 2005) (giving "little weight" to an expert conclusion because the expert "appear[ed] to have gotten his information about the appropriateness of [the student's] IEP from [the student's parent]," instead of "an independent review of [the student's] educational progress").

The court agrees that Ms. Anthony's opinions of A.S.'s education-related needs and progress suffered numerous deficiencies. As the ALJ emphasized, Ms. Anthony did not meet A.S., much less observe her in an educational setting. (*See* ALJ FF ¶ 83; Tr. 1571:9-10, 1582:6-16.) Nor did Ms. Anthony speak with any of A.S.'s teachers. (Tr. 1571:9-10.) Instead, Ms. Anthony based her opinions on conversations with L.C., samples of A.S.'s written work selected by the Parents, A.S.'s IEPs and test scores, Ms. Gorsuch's evaluation, and her own review of research on dyslexia. (*Id.* 1547:12-24, 1571:1-8, 1574:7-9, 1581:6-25, 1590:4-6.) Ms. Anthony acknowledged that, with respect to the writing samples the Parents provided her, she was not aware of the "instructions" or "expectations" that accompanied the assignments. (*Id.* 1588:14-1590:16.) Additionally, Ms. Anthony conceded that she was not familiar with the curriculum that applied to the math work product the Parents provided her. (*Id.* 1588:2-8.) Finally, Ms. Anthony testified that she does not hold a special education endorsement and, despite having "reviewed many IEPs . . . over the years," she began writing IEPs only in the 2016-17 school year. (*Id.* 1548:18-22, 1569:7-13.) In light of these deficiencies, the ALJ appropriately gave little weight to Ms. Anthony's opinions. *See, e.g.*, *Hellgate Elementary*, 541 F.3d at 1212.

### d. The Parents' Other Evidence

L.C. summarily argues that the ALJ "rejected all testimony and exhibits from [the] Parents that supported the Parent[s'] issues." (L.C. MSJ at 14.)  That objection is unfounded.  Throughout the proceedings, the ALJ afforded L.C. substantial latitude to examine witnesses and introduce evidence, often over the District's objections.  (*See, e.g.*, Tr. 119:15-131:10, 340:15-343:22.)  For example, the ALJ permitted L.C. to prompt A.S. to read from the witness stand, even as the ALJ expressed doubts that the exercise would be "helpful" to her disposition of the issues.  (*Id.* 128:18-22, 130:22-131:9.)  Likewise, the ALJ admitted the vast majority of the exhibits the Parents sought to introduce (*see* ALJ Order at 2), including samples of A.S.'s work that lacked context and were not produced at school (*see, e.g.*, Tr. 122:12-123:11).  Where relevant to her findings and conclusions, the ALJ cited or discussed the Parents' evidence.  (*See, e.g.*, ALJ FF ¶¶ 16, 20 (citing the Parents' evidence regarding standardized assessments); *id.* FF ¶ 45 (explaining weight given to J.S.'s testimony regarding 2015 IEP); *id.* FF ¶¶ 72-73 (discussing the Parents' evidence regarding the concerns they identified before the October 2016 IEP meeting); *id.* FF ¶ 82 (summarizing the Parents' concerns about A.S.'s alleged lack of progress); *id.* FF ¶¶ 83-89 (extensively summarizing the testimony of Ms. Anthony).)

### e. Miscellaneous Objections

L.C. raises several other broad objections to the ALJ's conduct of the hearing.   In particular, she argues that the ALJ only cited J.S.'s testimony "when it favored the [District]," erroneously found that some of the Parents' assertions during the hearing

relied on speculation, and refused to allow L.C. to ask questions "out of the scope" of the hearing. (L.C. MSJ at 14-16.) The court has considered these arguments and finds them meritless.

### f. Deference to the ALJ's Order

As the discussion above suggests, the AJL carefully presided over the due process hearing and produced a thorough, well-reasoned order. (*See generally* ALJ Order.) During the hearing, the ALJ actively questioned witnesses, including educators who work for the District. (*See, e.g.*, Tr. 1387:17-1390:1 (questioning Ms. Heras); *id.* 1874:23-1881:15 (questioning Ms. Schoot).) In addition, the ALJ exhaustively outlined the issues for the hearing. (ALJ Order at 2-6.) The ALJ supported her 89 findings of fact and 67 conclusions of law by citing extensively to the record and applicable law. (*See id.* at 6-38). Whenever the ALJ weighed evidence, she cogently explained her reasons for doing so. (*See, e.g.*, *id.* FF ¶ 83 (explaining why the ALJ gave Ms. Anthony's opinions "little weight").) In short, the ALJ's findings and conclusions "evince . . . her careful, impartial consideration of all the evidence and demonstrates . . . her sensitivity to the complexity of the issues presented." *Fresno Unified*, 626 F.3d at 438 (internal quotation marks and citation omitted). The court thus finds that the ALJ's decision is entitled to the "particular deference" afforded "thorough and careful findings." *See Napa Valley Unified*, 496 F.3d at 942 (internal quotation marks omitted). At the same time, the court notes that it would reach the conclusions that follow even if it the ALJ's order were not entitled to particular deference.

//

2. <u>Appropriateness of the District's 2015 and 2016 Evaluations</u>

The ALJ concluded that the District proved that it appropriately evaluated A.S. in the 2015 initial evaluation and the 2016 math evaluation and thus was not obligated to fund an IEE. (ALJ CL ¶¶ 21-23, 29.) L.C. argues that the ALJ's conclusions are not supported by the record and that the District failed to appropriately evaluate A.S. in both 2015 and 2016. (L.C. MSJ at 21, 25-29, 31-32, 35-38, 41-43.)

a. *Framework Governing Evaluations and Reevaluations*

Before providing special education and related services to a child with a disability, a school district must "conduct a full and individual initial evaluation." 20 U.S.C. § 1414(a)(1)(A). In so doing, the school district must comply with various procedural requirements. *Id.* § 1414(a)(1)(C); *see also* 34 C.F.R. §§ 300.304, .311; WAC 392-172A-03020. Among other things, the district must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent," to determine whether the child is eligible for special education and the content of the child's IEP. 34 C.F.R. § 300.304(b)(1); WAC 392-172A-03020(2). Those assessments must be "administered by trained and knowledgeable personnel" in accordance with standard assessment instructions. 34 C.F.R. §§ 300.304(c)(1)(iv), (v); WAC 392-172A-03020(3)(a)(iv), (v). Substantively, the school district's evaluation must encompass "all areas related to the suspected disability" and be "sufficiently comprehensive to identify all of the student's special education and related services

//

needs." 34 C.F.R. §§ 300.304(c)(4), (c)(6); WAC 392-172A-03020(3)(e). Reevaluations

follow the same procedures. *See* 34 C.F.R. § 300.303(a).

### b. *2015 Initial Evaluation*

L.C. alleges that A.S.'s 2015 initial evaluation was deficient on multiple

grounds.[11] First, she argues that the District "forced [the] Parents to get their own

evaluation [of A.S.] before they would offer her special education services." (L.C. MSJ

at 26.) Second, L.C. asserts that the District "rejected" Ms. Gorsuch's evaluation but did

not inform the Parents of that rejection until the due process hearing. (*Id.* at 27.) Third,

L.C. contends that District staff were not qualified to administer standardized

assessments to A.S. or erroneously administered those assessments. (*Id.* at 10, 14-15.)

Finally, L.C. argues that the District failed to appropriately assess A.S. "around her

disability of dyslexia." (*Id.* at 28-29.)

L.C.'s first contention—that the District "forced" the Parents to obtain an outside

evaluation of A.S. before evaluating her for special education services—is at odds with

the record. After A.S. finished first grade, L.C. contacted Ms. Lederman and requested

that the District evaluate A.S. for special education services. Ms. Lederman informed

L.C. that the school's guidance team would meet in September to discuss L.C.'s request

and asked that L.C. provide any outside information she wanted the team to consider.

(AR at 2916.) In no way did Ms. Lederman predicate the District's consideration of

---

[11] L.C. also argues that the District failed to evaluate whether A.S. was eligible for special education services in the 2014-15 school year, when A.S. was in first grade. (L.C. MSJ at 25-26.) As discussed above, L.C. did not allege in the due process complaint that the District violated the IDEA before A.S.'s second-grade year. *See supra* § III.C.1.a. Accordingly, the court declines to address that claim.

L.C.'s request for a special education evaluation upon the Parents' procurement of an

outside opinion.  (*See id.*)

L.C.'s second argument—that, unbeknownst to the Parents, the District "rejected"

Ms. Gorsuch's private evaluation but failed to so inform the Parents until the due process

hearing—is similarly unfounded.  (*See* L.C. MSJ at 27.)  L.C. focuses on a moment at the

hearing when counsel for the District expressed disagreement with L.C.'s representation

to the ALJ that A.S. "ha[d] a diagnosis of dyslexia."  (*Id.*; *see also* Tr. 192:13-17.)  L.C.

appears to argue that counsel's statement was the first time she learned that the District

disagreed with A.S.'s "disability diagnosis," and, therefore, the Parents "were denied

meaningful participation" in A.S.'s evaluation and the IEP process generally.  (L.C. MSJ

at 27.)  The court is unpersuaded.  As an initial matter, L.C. fails to recognize that Ms.

Gorsuch never formally diagnosed A.S. with dyslexia.[12]  Moreover, as discussed more

fully below, the District concluded that A.S. was eligible for special education services

through the category of "Specific Learning Disability," not dyslexia.  (*See* AR at 2962.)

Whether or not the District disagreed with the proposition that A.S. had been formally

diagnosed with dyslexia is therefore peripheral to the issues before the court.

In any event, the District reviewed and summarized Ms. Gorsuch's conclusions as

part of its initial evaluation of A.S.  In its 2015 evaluation report, the District noted that

Ms. Gorsuch observed in A.S. "average overall cognitive functioning, with well-below

_____

[12] The District also argues that Ms. Gorsuch, as a school psychologist, was not qualified
to diagnose A.S.  (Dist. MSJ at 3; *see also* AR at 3635.)  The Parents' own expert, Ms. Anthony,
conceded that school psychologists are not qualified to render formal diagnoses in Washington
State.  (Tr. 1570:5-10.)

average phonological processing skills as measured by the [Woodcock-Johnson IV]."

(*Id.* at 2961.) Additionally, in the section of the evaluation report titled

"Medical-Physical Findings," the District stated that, "as reported by [Ms.] Gorsuch, . . .

in her private evaluation, '[A.S.] demonstrated a pattern of academic and cognitive

strengths and weaknesses consistent with th[e] . . . specific learning disability of

dyslexia." (*Id.* at 2965.) The report also noted Ms. Gorsuch's characterization of

dyslexia as "a language-based learning disability" with a "cluster of symptoms,"

including difficulties with spelling, reading, and pronunciation. (*Id.*) In other words, far

from refusing to consider Ms. Gorsuch's assessment, the District integrated Ms.

Gorsuch's conclusions into its initial evaluation of A.S.[13]

L.C. also argues that District staff were either not qualified to administer

standardized assessments to A.S. or erroneously administered those assessments. (*See*

L.C. MSJ at 10, 14-15.) L.C. first insists that Ms. Heras "was not qualified to deliver,

interpret, or even view" the BASC-2 test, "according to test protocols." (*Id.* at 10.) Ms.

Heras credibly testified that she was appropriately trained to administer the BASC-2, and

L.C. cites no authority to the contrary. (*See* Tr. 1322:23-1323:12.) In addition, L.C.

contends that the BASC-2 was deficient because it relied, in part, on input provided by

---

[13] The court likewise rejects L.C.'s contention that Ms. Heras, the school psychologist who administered several of the standardized assessments during the District's 2015 initial evaluation of A.S., "refused to honor [Ms. Gorsuch's] evaluation and ignored the evaluation recommendations and diagnosis." (*See* L.C. MSJ at 11.) Ms. Heras testified that she "incorporated [Ms. Gorsuch's] results as well as her recommendations in [the initial] evaluation." (Tr. 1311:11-12.) The evaluation report supports Ms. Heras's testimony. (*See* AR at 2961, 2965.)

Ms. Clark, who at that point had taught A.S. for only 13 days. (L.C. MSJ at 31.) Yet, the evaluation team accounted for that variable. (AR at 2971 (stating that "the Teacher Rating Scale . . . should be interpreted with caution.").) L.C. also argues that Ms. Anthony's testimony showed that Ms. Shultz erroneously administered the CELF-5 to A.S. (L.C. MSJ at 4.) However, Ms. Anthony merely stated that that it "would be helpful" for an educator administering the CELF test to know whether the student has dyslexia. (AR at 2662.) Moreover, as the ALJ emphasized, Ms. Anthony admitted that, unlike Ms. Shultz, she is not a speech language pathologist and has never administered the CELF. (Tr. 1569:18-21, 1590:20-1591:3.) The ALJ thus properly discounted Ms. Anthony's criticisms of the District's administration of the CELF-5.

Finally, L.C. asserts that the District's initial evaluation of A.S. was deficient because the District did not specifically assess A.S. for dyslexia. (L.C. MSJ at 28-29, 35-37.) The ALJ properly rejected that argument. Under the IDEA, a student is eligible for special education and related services if that student is found to have a disability falling within one of several specific disability categories. *See* 34 C.F.R. § 300.8(a)(1); WAC 392-172A-01035(1)(a). "Dyslexia" is not a qualifying disability category. *See id.* Rather, dyslexia is but one example of various disabilities falling within the eligibility category of Specific Learning Disability. 34 C.F.R. § 300.8(c)(10)(i); WAC 392-172A-01035(1)(k)(i). As the ALJ recognized, the District appropriately tested A.S. "to determine if she had a specific learning disability in reading, writing, and/or math, be it dyslexia or some other type of [Specific Learning Disability]." (ALJ CL ¶ 12.) Relatedly, the IDEA does not give a parent the right to dictate specific areas in which a

school district must assess a student as part of a special education evaluation.  *See Avila v. Spokane Sch. Dist. 81*, 686 F. App'x 384, 385 (9th Cir. 2017) (holding that the school district properly assessed a student for a Specific Learning Disability and rejecting the parents' contention that the district was obligated to administer subtests designed to assess dyslexia and dysgraphia).

The court agrees with the ALJ's conclusion that the District appropriately assessed A.S. "in all areas related to [her] suspected disability" during the 2015 initial evaluation. *See* 34 C.F.R. § 300.304(c)(4); WAC 392-172A-03020(3)(e); (*see also* ALJ CL ¶ 12.) Qualified District personnel reviewed existing data on A.S., obtained input from the Parents, considered Ms. Gorsuch's private evaluation, conducted classroom observation, administered a battery of standardized assessments, and evaluated A.S. in writing, math, communication, and social-emotional functioning.  (*See* AR at 2960-88.)  Moreover, the District produced a detailed and comprehensive "evaluation report . . . sufficient in scope to develop an IEP."  (*See id.*); *see also* 34 C.F.R. § 300.304(b)(1); WAC 392-172A-03020(2).  The ALJ properly found that the District was not obligated to fund an IEE with respect to the 2015 initial evaluation.[14]

### c. *2016 Reevaluation*

With respect to the District's 2016 math reevaluation, L.C. argues that the IEP team failed to sign the reevaluation report, thereby rendering the entire evaluation

---

[14] L.C. also argues that the District's evaluation was inadequate because the District "skew[ed]" the tests, never gave A.S. "an IQ test," and "ignored" the Parents' questions about the evaluation.  (L.C. MSJ at 10, 11, 38.)  The court has considered these claims and finds them meritless.

inappropriate.  (L.C. MSJ at 29; *see also id.* at 25.)  The ALJ found that A.S.'s math reevaluation report "was not fully compliant because it was not signed and dated by each professional member" of the reevaluation team, as required by an applicable regulation. (ALJ CL ¶ 29); *see also* WAC 392-172A-03035(1) (providing that each professional involved in a student's evaluation or reevaluation must sign and date the evaluation report to certify that report "represents his or her conclusion").  The ALJ further concluded that "[t]his minor procedural violation does not render the evaluation inappropriate for purposes of the Parents' request for an IEE."  (ALJ CL ¶ 29.)

At the due process hearing, the District introduced an unsigned version of the math reevaluation report.[15]  (*See* AR at 3123.)  Yet, as the District points out, the Parents introduced a different version of the math reevaluation report, which shows that each professional member of the evaluation team signed and dated the report on November 29, 2016, the date the team discussed the results of the reevaluation.  (AR at 3631; *see also* Dist. MSJ at 21 n.17.)  The ALJ thus erred in concluding that the math reevaluation report was procedurally deficient for lack of signatures.  (*See* ALJ CL ¶ 29.)  However, this error was harmless, because, even assuming the evaluation team had failed to sign the math reevaluation report, the ALJ rightly concluded that the Parents could not show that such a minor procedural deficiency deprived A.S. of educational benefits or impeded

//

---

[15] The unsigned version of the report that the District introduced was part of a "Notice of Meeting" that the District sent to the Parents to alert them of the November 29, 2016, meeting the District had scheduled to discuss the math reevaluation.  (*See* AR at 3116-25.)

the Parents' rights to participate in the decision-making process.  *See* 20 U.S.C. §

1415(f)(3)(E)(ii); WAC 392-172A-05105(2).

L.C. also argues that the ALJ erroneously "declined to rule" on whether A.S. was

entitled to a "Language IEE." (L.C. MSJ at 42.)  Presumably, L.C. refers to the District's

decision, made at the October 27, 2016, IEP meeting, not to reevaluate A.S. in

"communication."[16]  Contrary to L.C.'s representations, the ALJ in fact considered the

Parents' argument that the District wrongly determined that it did not need to reevaluate

A.S. in communication to provide her a FAPE.  (ALJ CL ¶ 26.)

The ALJ correctly determined that the District was not obligated to reevaluate

A.S. in communication in 2016.  A school district must reevaluate a student if the district

determines that the student's performance warrants a reevaluation or upon the request of

the student's parent or teacher.  34 C.F.R. § 300.303(a).  However, a district need not

reevaluate a student in every area in which a parent requests reevaluation.  Rather, the

district must review "existing evaluation data" on the student and, on the basis of that

review and input from the parents, "identify what additional data, if any," are needed to

ensure the child receives a FAPE.  WAC 392-172A-03025(2).  The District did just that.

---

[16] L.C. appears to make a distinction between a "language" evaluation and a
"communication" evaluation, arguing that "an evaluation in language encompasses much more
than intelligible oral speech alone or 'communication.'" (L.C. MSJ at 42.)  That distinction is
not supported by the record, and L.C. fails to provide authority to the contrary.  Indeed, when the
District assessed A.S.'s communication skills during the 2015 initial evaluation, the District
examined A.S.'s "expressive and receptive language skills," her "ability to understand language
and use language," and her "articulation skills." (AR at 2982.)  Similarly, when determining
whether it was appropriate to reassess A.S. in communication in 2016, the District accounted for
A.S.'s "language skills." (*Id.* at 3103.)  The court therefore assumes that, when L.C. refers to a
"Language IEE," she is referring to the Parents' request, in 2016, that the District reassess A.S.
in communication. (*Id.* at 3102.)

At the October 27, 2016, IEP meeting, A.S.'s IEP team discussed with the Parents their request that the District reevaluate A.S. in communication. (AR at 3102-03.) A District speech language pathologist examined the communication component of A.S.'s 2015 initial evaluation, explained that that the testing "was strong and valid," and opined that "[t]here [was] no reason to believe that [A.S.'s] scores would drop significantly enough to qualify her for speech/language services." (*Id.* at 3103, 3108.) The District reasonably concluded that, at that time, it needed no further data on A.S.'s communication skills to ensure that A.S. received a FAPE. *See* WAC 392-172A-03025(2).

In sum, the court finds that the ALJ correctly concluded that both A.S.'s 2015 initial evaluation and her 2016 math reevaluation were appropriate under the IDEA. The ALJ also correctly concluded that the District was not obligated to reevaluate A.S. in communication in 2016. Accordingly, L.C. is not entitled to an IEE at District expense.

3. Whether the District Denied A.S. a FAPE by Failing to Develop or Implement Appropriate IEPs

L.C. argues at length that the District denied A.S. a FAPE by failing to develop and implement appropriate IEPs in the 2015-16 and 2016-17 school years. (*See generally* L.C. MSJ.) Her arguments fall into four categories: (1) the District's alleged procedural violations of the IDEA; (2) the alleged substantive shortcomings of A.S.'s IEPs; (3) the District's alleged failure to implement A.S.'s IEPs; and (4) A.S.'s alleged lack of educational progress.

//

//

### a. Alleged Procedural Violations

#### i. Parental Participation

"An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed." *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001). To that end, the IDEA requires that the IEP team include a parent, 20 U.S.C. § 1414(d)(1)(B)(i), and mandates that the IEP consider the concerns of the parent throughout the IEP process, 20 U.S.C. §§ 1414(c)(1)(B), (d)(4)(A)(ii)(III). Thus, "[a] school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification." *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1131 (9th Cir. 2003), *superseded by statute on other grounds*, 20 U.S.C. § 1414(d)(1)(B). However, a district does not necessarily violate the IDEA if it refuses to implement a parent's requests, and a parent does not have "veto" power over IEP provisions. *See Vashon Island*, 337 F.3d at 1131.

L.C. asserts that the ALJ erred in concluding that the District afforded the Parents meaningful participation in the formulation of A.S.'s IEPs. (L.C. MSJ at 15, 29-30; *see also* ALJ Order CL ¶¶ 37-40, 58.) Specifically, L.C. argues that, although the Parents were present at the IEP meetings, the District allowed the Parents only nominal participation in the IEP process and "ignored" the Parents' questions and requests. (L.C. MSJ at 29-30.) Her arguments lack merit.

//

First, the record demonstrates that the Parents actively participated in all but one of A.S.'s evaluation-related and IEP team meetings.  Both Parents attended the October 15, 2015, meeting at which District staff reviewed the results of A.S.'s initial evaluation.  (AR at 2993.)  A few weeks later, on November 5, 2015, J.S. attended an IEP meeting with A.S.'s IEP team, with which he reviewed A.S.'s draft IEP.  (*Id.* at 3008; *see also* Tr. 1845:4-11.)  L.C. was ill and unable to attend, but the Parents did not request that the District reschedule the meeting.  (Tr. 1631:13-1632:11; *see also id.* 1844:6-15.)  During the 2015-16 school year, the District agreed to hold two additional meetings with A.S.'s IEP team—in February 2016 and August 2016—so that the Parents could express their concerns about A.S.'s progress under her IEP.  (AR at 3044-51, 3068-79.)  At both meetings, the IEP team thoroughly discussed and documented the Parents' questions and IEP-related requests.  (*Id.* at 3049-51 (PWN memorializing February 2016 meeting); *id.* at 3068-79 (District notes from August 2016 meeting); *id.* at 3327-41 (L.C.'s proposed amendments to the District's notes).)  Further, both Parents attended and actively participated in the October 27, 2016, IEP team meeting, where the IEP team agreed to the Parents' proposal to reevaluate A.S. in math and thoroughly discussed several other of the Parents' IEP-related requests.  (*Id.* at 3102-03 (PWN memorializing October 2016 meeting); *id.* at 3104-11 (District notes from October 2016 meeting); *id.* at 3299-306 (L.C.'s proposed amendments to the District's notes).)  Finally, in November 2016, although the District repeatedly invited the Parents to discuss A.S.'s math reevaluation, the Parents declined; by that point, the Parents had already filed a request for a due process hearing.  (*See id.* at 2904, 3116-17.)

L.C. fails to show that either of the Parents was denied meaningful participation in any meeting with A.S.'s IEP team. (*See generally* L.C. MSJ.) To the contrary, the record shows that the District considered the Parents' input and concerns, and, in some cases, adjusted their efforts to implement A.S.'s IEP accordingly. For example, in October 2015, the District agreed to the Parents' request that A.S. be given an assistive technology evaluation. (AR at 2994.) Moreover, during the February 2016 meeting, the IEP team, in response to the Parents' concerns, agreed that A.S. would be given a BrightLines notebook to use at home, that A.S. would not participate in state or District standardized testing, that Ms. Clark would encourage A.S. to use Co:Writer in the general education classroom, that A.S. would not be provided crosswords or word puzzles, and that A.S. would not work with parent volunteers in the general education classroom. (*Id.* at 3051.) Whenever the IEP team declined to implement the Parents' requests, the IEP team gave reasonable reasons for doing so and communicated those reasons to the Parents. (*See, e.g.*, *id.* at 3049-50, 3102-03.) In short, the record fully supports the ALJ's conclusion that the District allowed the Parents to meaningfully participate in the IEP process.

Additionally, L.C. contends that the District took "prejudicial" notes during the IEP meetings and refused to accept L.C.'s "amended notes." (L.C. MSJ at 34-35.) According to L.C., the District's alleged refusal to properly document the IEP meetings rendered each meeting noncompliant with IDEA requirements, such that A.S. "has never been given a legal IEP." (*Id.* at 35.) These claims lack merit. To begin, L.C. cites no authority that requires a school district to amend any internal notes of IEP team meetings

in accordance with a parent's wishes.  (*See generally id.*)  Moreover, the court finds that, regardless of the alleged deficiencies in the District's internal records of the IEP team meetings, the PWNs the District produced comprehensively and accurately documented the Parents' input and concerns.  (*See* AR at 3049-50, 3102-03.)  Finally, even if the court were to disregard the District's notes and rely exclusively on the amended records produced by L.C. (*see id.* at 3299-306, 3327-41), the court would still find that the District afforded the Parents an opportunity to meaningfully participate in the IEP process.[17]

L.C.'s remaining arguments regarding parental participation are at odds with the record.  L.C. argues that the IEP team "forced" the Parents to sign A.S.'s 2016 IEP by telling them it was an "attendance sheet."  (L.C. MSJ at 28.)  L.C. cites no credible evidence to support that contention.  (*See generally id.*)  Additionally, L.C. argues that it was not clear to the Parents who was on A.S.'s IEP team.  (*Id.* at 34.)  But, the Parents attended numerous meetings attended by all members of A.S.'s IEP team, the IEP team documents clearly identify the members of the IEP team, and L.C. herself emailed several members of the IEP team on multiple occasions.  (*See, e.g.*, AR at 2964, 3008, 3089, 3112.)  L.C. also insists that A.S.'s IEPs had numerous typographical errors, which "confused the Parents on [A.S.'s] specific IEP goals and measurements."  (L.C. MSJ at

---

[17] Additionally, L.C. argues that the ALJ relied only on the District's records of the IEP meetings and "ignor[ed] [L.C.'s] amended notes" when making her findings and conclusions. (L.C. MSJ at 35.)  In fact, the ALJ cited and relied upon a version of L.C.'s notes in making her factual findings.  (*See* ALJ FF ¶¶ 58, 72-73 (citing Parents' Exhibit 10, found at AR at 3298-403).)

31.) Because L.C. did not raise this issue at the due process hearing, it falls outside the scope of the court's review. (*See* ALJ Order at 2-6.) In any event, L.C. fails to show exactly how any typographical errors in A.S.'s IEPs impeded the Parents' ability to participate in the IEP process. (*See generally* L.C. MSJ.) Finally, L.C. argues that the District did not adequately explain A.S.'s modified grading system. (*Id.* at 33.) The record shows, however, that the District explained the grading system to the Parents and the Parents raised no questions at that time. (AR at 4136.) L.C. cites no evidence that the Parents subsequently expressed to the District any questions or concerns about the grading system. (*See generally* L.C. MSJ.)

The IDEA does not require a school district comply with every request a parent makes; rather, the district must "seriously consider" the parents' input and concerns. *K.S. ex rel. P.S. v. Fremont Unified Sch. Dist.*, 545 F. Supp. 2d 995, 1008 (N.D. Cal. 2008). The record shows that the District did precisely that. The ALJ correctly concluded that the District afforded the Parents an opportunity to meaningfully participate in the IEP process.

### ii. Predetermination

Relatedly, L.C. argues that the District "predetermined" A.S.'s educational placement and IEP content without parental input. (L.C. MSJ at 29-30.) "A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement." *K.D. ex rel. C.L. v. Dep't of Educ., Hawaii*, 665 F.3d 1110, 1123 (9th Cir. 2011). "Predetermination violates the

//

IDEA because the Act requires that the placement be based on the IEP, and not vice versa." *Id.*

L.C.'s predetermination claim appears to have two parts. First, L.C. alleges that, in 2016, during A.S.'s third-grade year, Ms. Schoot and Ms. Van de Vord held an IEP meeting "to decide [A.S.'s] present levels, curriculum, and computer accommodations without [the] Parents being informed or present or calling an IEP meeting." (*Id.* at 30.) Second, L.C. asserts that the District predetermined A.S.'s placement because the IEP presented at the October 27, 2016, IEP team meeting did not reflect the "changes" the Parents suggested to the draft IEP before the meeting. (*Id.*)

L.C.'s predetermination claim fails for several reasons. First, L.C. appears not to have argued in the due process hearing that the District predetermined A.S.'s educational placement. (*See generally* ALJ Order at 2-6; AR at 2904-07.) The issue is thus outside the court's review. Even if the Parents' due process complaint could be construed to raise a predetermination claim, L.C. cites no credible evidence to support her allegation that the District predetermined A.S.'s 2016 educational placement before the October 27, 2016, IEP meeting. (*See generally* L.C. MSJ.) To support her contention that the District held an IEP meeting without the Parents, she cites only the testimony of Ms. Schoot that, on one occasion, Ms. Schoot "had a conversation" with Ms. Van de Vord—without the rest of the IEP team—about the fact that a particular speech-to-text program on A.S.'s computer was not working. (Tr. 1776:3-19; *see also* L.C. MSJ at 30.) That conversation neither affected A.S.'s educational placement nor excluded the Parents from the IEP process.

1    Additionally, the court is unpersuaded that the District "predetermined" A.S.'s

2 educational placement because it did not modify the draft IEP in accordance with the

3 Parents' preferences. (L.C. MSJ at 30.) Far from rejecting out-of-hand the Parents'

4 proposed changes to the 2016 IEP, the IEP team both carefully communicated their

5 concerns about some of the Parents' requests before the IEP team meeting and

6 thoroughly discussed those requests at the meeting. (AR at 3082-86, 3102-03.) That

7 members of the IEP team may have had "pre-formed opinions" regarding A.S.'s

8 placement and accommodations is irrelevant. *See S.P. ex rel. Penalosa v. Scottsdale*

9 *Unified Sch. Dist. No.* 48, No. 2:12-cv-01193 JWS, 2013 WL 5655527, at *6 (D. Ariz.

10 Oct. 13, 2013) (explaining that "school evaluators may prepare reports and come with

11 pre-formed opinions regarding the best course of action for the child as long as they are

12 willing to listen to the parents and parents have the opportunity to make objection and

13 suggestions") (quoting *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir.

14 2006)). The court thus rejects L.C.'s predetermination claim.

15                          iii. Expiration of the IEP

16    L.C.'s final procedural claim relates to the expiration of A.S.'s 2015 IEP. (L.C.

17 MSJ at 32.) The ALJ found that the District allowed A.S.'s 2015 to expire three days

18 before the 2016 IEP took effect. (ALJ Order ¶¶ 63-64.) Although the ALJ found that

19 this lapse constituted a procedural violation of the IDEA, she concluded that the District

20 did not deny A.S. a FAPE because the 2016 IEP went into effect just three days later.

21 (*Id.*)

22 //

An ALJ may find that a school district's procedural violation denied a child a

FAPE only where the procedural violation:  (1) impeded the child's right to a FAPE; (2)

infringed the parent's opportunity to participate in the decision-making process regarding

the provision of a FAPE; or (3) caused a deprivation of educational benefits.  34 C.F.R.

§ 300.513(a)(2); WAC 392-172A-05105(2); *see also J.L. v. Mercer Island Sch. Dist.*, 592

F.3d 938, 953 (9th Cir. 2010).  The ALJ correctly found that the Parents failed to show

that the expired IEP impeded A.S.'s right to a FAPE, impeded the Parents' opportunity to

participate in the IEP process, or otherwise deprived A.S. of an educational benefit.  (*See*

ALJ CL ¶¶ 63-64.)

   *b.  Alleged Substantive Violations*

"To meet its substantive obligation under the IDEA, a school must offer an IEP

reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances."  *Endrew F.*, 137 S. Ct. at 999.  To accomplish this goal, the IEP team

must consider a child's current levels of academic achievement, describe how a child's

disability affects his or her ability to perform, and set measurable goals of academic

progress for the upcoming year.  *See* 20 U.S.C. § 1414(d)(1)(A)(i).  Above all, the IEP

team is charged with developing a "comprehensive plan" that is "'tailored to the unique

needs' of a particular child."  *Endrew F.*, 137 S. Ct. at 994 (quoting *Rowley*, 458 U.S. at

181).

   L.C. argues that the District failed to uphold its substantive obligation under the

IDEA because:  (1) A.S.'s IEPs did not integrate a dyslexia-specific curriculum; (2)

District staff were not specifically trained to work with children with dyslexia; (3) the

IEPs did not address all areas of A.S.'s disability; (4) the IEP team failed to set appropriate goals; (5) the IEPs did not include appropriate accommodations; and (6) the IEPs did not provide ESY services. The court addresses these arguments in turn.

> i. Dyslexia-Specific Instructional Methodology

L.C. argues that A.S.'s IEPs failed to meet her "unique needs" because the IEPs "lump[ed] [A.S.] in with students having other [specific learning disabilities]" and failed to rely upon methods or curricula designed specifically for a student with dyslexia. (L.C. MSJ at 1; *see also id.* at 2, 8, 39.) Construed liberally, L.C.'s arguments put two issues before the court: Did the IDEA require that the District incorporate dyslexia-specific methodologies into A.S.'s IEPs? And, if not, were A.S.'s IEPs sufficiently tailored to meet her unique needs?

The ALJ correctly concluded that the District was not obligated to integrate dyslexia-specific methodologies or curricula into A.S.'s IEP. (*See* ALJ CL ¶ 32.) School districts "are entitled to substantial deference in deciding what programming is appropriate as a matter of educational policy," *Mercer Island Sch. Dist.,* 592 F.3d at 945 n.5 (citing *Rowley*, 458 U.S. at 206), and need not specify an instructional methodology in an IEP unless that methodology is necessary to enable the student to receive a FAPE, *id.* at 952 (citing 64 Fed. Reg. 12,552). Courts have repeatedly held that parents do not have a right to compel a school district to employ a specific curriculum or methodology when educating a child with a disability. *See, e.g.*, *Tucker v. Calloway Cty. Bd. of Educ.*, 136 F.3d 495, 506 (6th Cir. 1998) ("Case law is clear that the [parents] are not entitled to dictate educational methodology or to compel a school district to supply a specific

program for their disabled child."); *see also D.T. v. Seattle Sch. Dist.*, No. C10-0759JLR, 2011 WL 5282715, at *13 (W.D. Wash. Nov. 2, 2011). Relatedly, courts have concluded that, absent a showing that dyslexia-specific methods are necessary to ensure that a child with dyslexia receives an appropriate education, school districts may lawfully decline to integrate those methods into an IEP. *See, e.g.*, *Robinson ex rel. Robinson v. Council Rock Sch. Dist.*, No. 05-1988, 2006 WL 1983180, at *5-6 (E.D. Penn. July 12, 2006) (holding that a dyslexic child's IEP provided a FAPE, "despite its lack of comprehensive phonics program designed to treat dyslexia," because it was specifically designed to meet the student's needs in the area of written expression); *see also Wood v. Katy Indep. Sch. Dist.*, 163 F. Supp. 396, 418-19 (S.D. Tex. 2015).

Here, L.C. does not show that A.S. required a dyslexia-specific instructional methodology to receive a FAPE. L.C. relies exclusively on the opinions of Ms. Anthony, who testified that students like A.S. require "a multisensory approach[] [to] instruction that is explicit and direct" and asserted that it is "absolutely imperative" that educators use such methods in teaching dyslexic children. (Tr. 1505:13-1506:11.) Ms. Anthony also stated that she would recommend Orton-Gillingham instruction for A.S. (*Id.* 1505:17-21, 1523:3-6.) As explained above, the ALJ appropriately gave Ms. Anthony's testimony "little weight" because Ms. Anthony never met A.S., never spoke with A.S.'s teachers, and primarily based her opinions on discussions with L.C. and document review. *See supra* § III.C.1.c.; (*see also* ALJ FF ¶ 83.) Even if the court were to credit Ms. Anthony's testimony on dyslexia-specific curricula, however, it would establish only that, in the long run, A.S. would best be served by the programmatic interventions Ms.

Anthony endorsed. *See Robinson*, 2006 WL 1983180, at *6. Yet, the IDEA does not require the District to design a program to maximize A.S.'s educational potential: the IEP must only be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.

The record demonstrates that A.S.'s IEPs were reasonably calculated to enable A.S. to make progress in light of her disability. Pursuant to the 2015 initial evaluation, A.S.'s IEP team appropriately concluded that A.S. was eligible for specially designed instruction in two areas: reading and written expression. (AR at 2961.) The IEP team therefore arranged for A.S. to receive specially designed instruction in reading, specially designed instruction in writing, and numerous accommodations in the general education setting. (*Id.* at 3023-24, 3026.) The uncontroverted evidence shows that, even after just a few months, A.S. was progressing in both her specially designed instruction and in the general education curriculum. From November 2015 to October 2016, for example, A.S. progressed from level "G" to level "J" in the F&P reading assessment program.[18] (*Id.* at 3044, 3092; *see also id.* at 3031-34 (documenting progress toward or satisfaction of short-term objectives in reading comprehension and writing).) Moreover, at the hearing, A.S.'s teachers credibly testified that A.S. demonstrated meaningful progress under her IEPs, even if she did not yet meet all grade-level expectations. (*See* Tr. 1095:16-1096:7, 1099:12-15, 1181:17-1183:21, 1871:8-1874:21 (testimony of Ms. Schoot); *id.* 615:25-616:13, 714:24-715:3, 729:19-25, 730:7-734:23, 739:17-740:13 (testimony of

---

[18] Additionally, Ms. Schoot testified that, as of December 2016, A.S. was reading at F&P level "M." (Tr. 1871:11-19.)

Ms. Clark).)  L.C. fails to show that A.S.'s IEP was insufficiently tailored to meet her unique needs.

### ii.  Teacher Training

L.C. further appears to argue that A.S.'s IEPs were inadequate because the District staff who implemented the IEPs were not specifically trained to work with children with dyslexia.  (L.C. MSJ at 8, 15.)  The proper inquiry, however, is not whether A.S.'s teachers were trained to teach dyslexic students, but rather whether District staff were sufficiently trained to implement the IEP.  *See, e.g.*, *Ganje ex rel. J.M.G. v. Depew Union Free Sch. Dist.*, No. 11-CV-00665-RJA-JJM, 2012 WL 5473491, at *11 (W.D.N.Y. Sept. 26, 2012), *report and recommendation adopted*, No. 11-CV-665A, 2012 WL 5473485 (W.D.N.Y. Nov. 9, 2012) (rejecting the parent's claim that the District was required to provide teachers "trained in teaching dyslexic students").  L.C. provides no evidence that A.S.'s educators lacked the training necessary to fully implement A.S.'s IEP.  (*See generally* L.C. MSJ.)  Indeed, the District's educators credibly testified that they were adequately trained to address A.S.'s disabilities in reading and writing.  (*See, e.g.*, Tr. 703:20-704:4, 1057:9-12, 1112:22-24; *see also* AR at 4321-25.)  The ALJ properly concluded that the District did not violate the IDEA by not implementing A.S.'s IEPs through educators trained in dyslexia-specific instruction.  (*See* ALJ Order CL ¶ 42.)

### iii. Areas of Disability

L.C. also appears to contend that A.S.'s IEPs failed to provide specially designed instruction in all areas of A.S.'s disability.  (*See* L.C. MSJ at 31-32, 41-43.)  Specifically, L.C. insists that A.S. was eligible for specially designed instruction in math and A.S.'s

IEP should have included social skills goals.  (*See id.*)  With respect to math, the District properly concluded that, based on the 2015 initial evaluation, A.S.'s math skills were in the average range and A.S. did not qualify for specially designed math instruction.  (AR at 2977, 2993.)  Likewise, the District properly concluded that, considering the 2016 math reassessment, A.S. "[did] not have a Specific Learning Disability in math."  (*Id.* at 3121.)  With respect to social skills, the District reasonably concluded that, based on the 2015 initial evaluation, A.S. did not require specially designed instruction in social-emotional functioning.  (*Id.* at 2961-62, 2971-72.)  L.C.'s objections regarding the lack of specially designed instruction in math and social skills are unfounded.

iv.  Appropriateness of IEP Goals

L.C. asserts that A.S.'s IEP goals were deficient for various reasons.  (L.C. MSJ at 38-39.)  First, she contends that the 2016 IEP goals were deficient because they were "substantially the same as the second grade IEP goals."  (*Id.* at 38.)  That argument lacks merit.  The 2015 and 2016 goals appropriately targeted the same areas—reading and written expression.  However, the 2016 goals included updated, and more ambitious, metrics in reading, reading comprehension, and writing.  (*Compare* AR at 3020-22 *with id.* at 3092-93.)  That the goals were similar is reasonable, as well as irrelevant to whether the goals were deficient.

L.C. also contends that A.S.'s IEP goals "were not appropriately ambitious in light of [A.S.]'s circumstances of being dyslexic."  (L.C. MSJ at 38-39.)  She relies on Ms. Anthony's testimony for support.  (*Id.*)  According to Ms. Anthony, A.S.'s 2015 IEP failed to address issues of "phonological awareness" and set only "pretty generic" goals.

(Tr. 1551:5-10.)  Similarly, Ms. Anthony opined that A.S.'s 2016 IEP goals were targeted to "fluency and reading comprehension skills without addressing the foundation that has to be in place for those other goals to be met." (*Id.* 1595:14-20.)  Again, the ALJ appropriately gave little weight to Ms. Anthony's testimony about A.S.'s IEP goals.  *See supra* § III.C.1.c.  In addition, as emphasized above, the District was not obligated to formulate IEP goals that tracked a dyslexia-specific curriculum or methodology, as long as the goals met the needs resulting from A.S.'s disability and were reasonably calculated to support her educational progress.  *See supra* § III.C.3.b.i; *see also Endrew F.*, 137 S. Ct. at 999.  The record suggests that A.S.'s IEP goals satisfied both counts.  (*See, e.g.*, AR at 3092-93 (documenting that A.S. met or progressed toward all her 2015 IEP goals); *see also* Tr. 1095:16-1096:7, 1099:12-15, 1181:17-1183:21, 1871:8-1874:21 (testimony of Ms. Schoot); *id.* 615:25-616:13, 714:24-715:3, 729:19-25, 730:7-734:23, 739:17-740:13 (testimony of Ms. Clark).)

Accordingly, the ALJ properly rejected L.C.'s claim that A.S.'s IEP goals were inappropriate.  (*See* ALJ CL ¶¶ 35-36, 51-53.)

### v.  Accommodations

L.C. also argues that the District failed to provide appropriate accommodations in A.S.'s IEPs.  (L.C. MSJ at 39.)  L.C. appears to argue that the District erroneously "carried over" to the 2016-17 school year certain accommodations adopted during the 2015-16 school year.  (*Id.*)  L.C. fails to explain, however, why any of these accommodations were inappropriate or inadequate.  (*See generally id.*)  L.C. also claims that the District denied "all" of the Parents' requested accommodations and, in particular,

refused to grant the Parents' request to amend the IEP to remove the use of Co:Writer. (*Id.* at 40.)  Yet, the IEP team adopted several of the Parents' requested accommodations (*see* AR at 3051) and gave reasonable explanations for declining to adopt others (*see, e.g.*, *id.* at 3049-50, 3102-03).  Moreover, L.C. cites no evidence to support her contention that the Parents informed the District that they were dissatisfied with Co:Writer and asked that it be removed from the IEP.  (*See generally* L.C. MSJ.)  The ALJ properly found that A.S.'s IEPs included appropriate accommodations.  (*See* ALJ CL ¶¶ 49-50.)

vi.  Extended School Year ("ESY") Instruction

L.C. contends that the District denied A.S. a FAPE because it failed to provide ESY services during her second- and third-grade years.  (L.C. MSJ at 33.)  The Parents did not raise a claim regarding ESY services before the ALJ, and this issue falls outside the court's review.  (*See* ALJ Order at 2-6.)  Moreover, even if the Parents had raised a claim regarding ESY, L.C. fails to show that ESY services were "necessary to permit [A.S.] to benefit from [her] instruction."  *Hellgate Elementary*, 541 F.3d at 1212 (explaining that ESY services are integral to a FAPE only when the benefits a child gains during a regular school year will be significantly jeopardized if she is not provided ESY services during the summer) (internal quotation marks and citation omitted).

### c.  IEP Implementation

L.C. appears to argue that the ALJ erred in finding that the Parents failed to show that the District materially failed to implement A.S.'s IEP.  (*See* L.C. MSJ at 33, 40; *see also* ALJ CL ¶ 60.)  Specifically, L.C. asserts that A.S.'s IEP team failed to inform the

Parents that the Co:Writer program on A.S.'s computer did not always function.  (L.C. MSJ at 33, 40.)  Even if the court assumes that A.S. was at times unable to use her computer, L.C. cites no evidence to support "more than a minor discrepancy" between the services required by A.S.'s IEP and the services the District provided.  *See Van Duyn*, 502 F.3d at 815 (holding that a school district violates the IDEA only if "it is shown to have materially failed to implement the child's IEP," and "[a] material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP").  The ALJ correctly found that the Parents failed to demonstrate that the District materially failed to implement A.S.'s IEP.  (*See* ALJ CL ¶ 60.)

### d.  A.S.'s Educational Progress

Finally, L.C. appears to argue that the District denied A.S. a FAPE in the 2015-16 and 2016-17 school years because A.S. did not "progress[]."  (L.C. MSJ at 18-19.)  The record does not support L.C.'s contention that A.S. failed to demonstrate meaningful educational progress.  In 2015, for example, A.S. met or progressed toward all four of her IEP goals.  (AR at 3092-93.)  From November 2015 to October 2016, A.S. progressed from instructional level "G" to instructional level "J" in the F&P reading assessment program.  (*Id.* at 3044, 3092; *see also* Tr. 1871:11-19.)  And, as A.S.'s teachers credibly testified, A.S. exhibited significant academic gains in both the 2015-16 and 2016-17 school years.  (*See* Tr. 1095:16-1096:7, 1099:12-15, 1181:17-1183:21, 1871:8-1874:21 (testimony of Ms. Schoot); *id.* 615:25-616:13, 714:24-715:3, 729:19-25, 730:7-734:23, 739:17-740:13 (testimony of Ms. Clark); *id.* 2061:5-2063:20, 2111:11-2112:7 (testimony

of Ms. Van de Vord.) L.C. provides no credible evidence to refute these indications that A.S. made meaningful educational progress under her IEPs.[19]

### 4. Summary

The court acknowledges that the Parents are committed to ensuring that A.S. receives the education she is due under the law. Yet, the IDEA does not require that the District provide A.S. the best possible education at public expense; nor does it obligate the District to enable A.S. to maximize her academic potential. *See Endrew F.*, 137 S. Ct. at 1001. Rather, the IDEA demands that the District provide A.S. "an educational program reasonably calculated to enable [her] to make progress in light of [her] circumstances." *Id.* For the reasons discussed above, the District upheld that obligation. The ALJ properly found that A.S. is not entitled to an IEE at District expense and that the Parents failed to show that the District denied A.S. a FAPE in the 2015-16 and 2016-17 school years.

## IV. CONCLUSION

For the foregoing reasons, the court DENIES L.C.'s motion to amend the complaint (Dkt. # 64), DENIES L.C.'s motion for summary judgment (Dkt. # 34),

---

[19] At the hearing, the Parents asked A.S. to read aloud to the ALJ. (*See* Tr. 130:22-131:9.) L.C. argues that the ALJ "dismissed" A.S.'s "reading testimony." (L.C. MSJ at 19.) The ALJ properly gave little weight to A.S.'s reading demonstration because it lacked context and did not take place in an educational setting. (ALJ FF ¶ 82.) Additionally, L.C. appears to argue that the ALJ erroneously overlooked various pieces of A.S.'s work, introduced by the Parents, that allegedly showed A.S.'s lack of progress in math, writing, and other areas. (*See* L.C. MSJ at 20-22; L.C. Reply at 15-18; *see also, e.g.*, AR at 3783-3887.) The ALJ appropriately emphasized that the work samples lacked context and "do not carry greater weight than the testimony of the teachers who work with [A.S.] on a regular basis and evaluate her work." (ALJ FF ¶ 82.)

GRANTS the District's motion for summary judgment (Dkt. # 35), and AFFIRMS the order of the ALJ. The court DIRECTS the clerk to enter judgment for the District and close this case.

Dated this 8th day of May, 2019.

The Honorable James L. Robart
U.S. District Court Judge